**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-393 (RDM)** |
| **v.** | : | |
| | : | |
| **HUNTER PALM,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Hunter Palm was a cadet with the El Paso County Sheriff's Office. He comes from law enforcement, and he allegedly aspires to be in law enforcement. He should not be. On January 6, 2021, Palm could have helped officers in need around him, but he helped make space for tear-gassed rioters on the restricted United States Capitol grounds. He could have helped any of the hundreds of officers around him by leaving, but he stormed by them and inside the Capitol building, making it all the way to then-Speaker Nancy Pelosi's conference room. He was part of a violent mob hellbent on disrupting the 2020 presidential election.

Yes, Palm is young, and he was not violent inside the Capitol, nor did he destroy any property. In fact, he encouraged other rioters *not* to damage the Capitol. And he has at least tried to right his wrong. He voluntarily interviewed with the FBI in February 2021 before he was charged and admitted to some of his actions (but omitted others). He provided the FBI a thumb-drive with the videos he recorded on January 6 (only after wiping his phone of all January 6 content—leaving the government to take his word he put everything on the thumb-drive). And he brought in the clothes he wore inside the Capitol on January 6 (including, ironically, his allegedly pro-law enforcement hat). Palm now faces sentencing for misdemeanor disorderly conduct with an intent to disrupt the electoral process with an advisory Guidelines range of 0-6 months' imprisonment, a benefit the government conveyed by way of a plea agreement.

1

That is where Palm's benefit should end. The Court should sentence Palm to a period of incarceration, not only because his conduct was serious, but also because he repeatedly lied to the FBI in his interview. Despite his claims to the contrary, Palm was not forced up the Northwest Stairs for fear of being trampled. He was not pushed inside the Capitol building. He was not helplessly moved down the House Hallway. Palm acted intentionally, and criminally, on January 6.

On July 21, 2023, Palm pleaded guilty to engaging in disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2), and he faces an agreed-upon advisory Sentencing Guidelines range of 0-6 months' incarceration. Palm's actions on and after January 6 warrant a sentence of 6 months' incarceration, 12 months of supervised release, 100 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

## I.    Factual and Procedural Background

### *Defendant Palm's Role in the January 6, 2021 Attack on the Capitol*

Defendant Hunter Palm participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1] To avoid unnecessary repetition, the government refers to the

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by  the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary

general summary of the attack on the U.S. Capitol in Palm's signed Statement of Offense. *See* ECF 42.

On January 5, 2021, Hunter Palm traveled to Washington D.C. from Colorado Springs, Colorado and, on January 6, attended the former President's "Stop the Steal" rally by the Ellipse with two family members. *See* ECF No. 31 at ¶¶ 8, 9. Palm is squared in yellow in a photo from open-source video near the Washington Monument, wearing a dark hat and the American flag draped around his shoulders. *See* Image 1.



*Image 1: Screenshot of Open-Source Video of Palm near the Washington Monument*

($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**Palm Breaches the Restricted Grounds**

After the rally, Palm's family members returned to their Airbnb, but Palm joined the crowd of people headed toward the United States Capitol. Eventually, Palm joined the crowd gathering on the West Lawn of the Capitol grounds, near the Northwest Scaffolding. There, Palm saw rioters tearing down the white scaffolding erected for the upcoming Inauguration and transfer of presidential power, as Palm later admitted in an interview with the FBI. Palm also recorded his surroundings on his mobile phone. He also heard explosions, saw police tear gas, warned other rioters to "watch your eyes," and coughed as he himself breathed in tear gas. *See* Exhibit 1. Palm even observed rioters retreating from the front line, tears streaming down their faces, and ordered those around him to "make a hole" and "let them through." *See* Exhibit 1.



*Image 2: Screenshot of Exhibit 1 from Palm's phone at timestamp 0:05.*

Rather than leave, Palm pushed forward. He pulled his flag around his face, hoisted his Trump 2020 flag, and marched up the Northwest Stairs to the Capitol, as captured by open-source news video. *See* Exhibit 2 from 10:15 through 11:25, Image 3 (screenshot of Exhibit 2). He also recorded his march up the Northwest Stairs. Along the way, he celebrated his progress towards the Capitol by screaming, "Fuck yeah!," "Stop the steal!," and "Holy shit!" *See* Exhibit 3.



*Image 3: Screenshot of Exhibit 2 at timestamp 11:03*

**Palm Breaches the Capitol**

At approximately 2:15 p.m., Palm deliberately breached the Capitol building through the Senate Wing Doors as other rioters were breaking doors and windows into the building. Palm recorded his breach: rioters were entering shattered windows, alarms were piercing the air, and Palm was shouting, "We're in the Capitol building!," "Hold the line!," and "Whose house? Our house!" *See* Exhibit 4.



*Image 4: Screenshot from Surveillance Footage Near Senate Wing Doors at 2:15 p.m.*

Palm joined the first wave of rioters to breach the Capitol at that entry, entering approximately two minutes after the first rioters broke through. And he did not stop. Palm would spend the next 30 minutes marching and recording throughout multiple parts of the Capitol, many of which were significant to the constitutional and statutory process scheduled to take place at that moment.

## The Crypt

From the Senate Wing Door, Palm marched with other rioters to the Crypt, where he remained until approximately 2:27 p.m. There, Palm recorded rioters flooding into the room and outnumbering police officers attempting to stop them. Palm joined other rioters in triumphant chants. *See* Exhibits 5 and 6. He also stood his ground. *Id.* And when the mob turned physical and pushed its way past the officers, Palm recorded the chaos, capturing officers frantically trying and failing to stop the rioters. *See* Exhibit 7. Open-source video captured Palm in the middle of the mayhem. *See* Exhibit 8 from timestamp 19:45 through 20:30 (showing Palm at the end).



*Image 5: Screenshot of Exhibit 7 from Palm's Phone at Timestamp 0:02*

**Then-Speaker Pelosi's Suite**

By 2:28 p.m., Palm and other rioters had moved past the officers in the Crypt and breached a hallway toward then-Speaker Pelosi's suite of conference rooms and offices. As he passed the outnumbered officers, Palm continued to record his path through the Capitol. *See* Exhibit 9. He also continued to celebrate his feat. Marching through the House Hallway, Palm yelled, "The people got something to say!" Other rioters joined, "Nancy, where are you?" and "We're gonna kill her." *Id.* Soon after, Palm warned, "Guys, put away your phones. You don't want to take any unnecessary pictures." *Id.* And while some rioters damaged property and banged on each office door, Palm exclaimed, to his credit, "Don't break anything, we're not Antifa." *Id.* Toward the end of the hall, one rioter opened the doors into one of then-Speaker

7

Pelosi's conference rooms which was clearly marked with a sign above that read, "Office of the Speaker." *Id*. Another rioter yelled, "Come on you cunt Pelosi, get the fuck outta here." Despite knowing that this was then-Speaker Pelosi's hallway and conference room, and despite knowing that other rioters around him were threatening violence toward her, Palm entered the room. *Id*.

Inside, Palm asked other rioters, "You guys want a tour?" *Id*. On the conference table, Palm spotted an open laptop with a lit screen. Another rioter clicked "control-alt-delete," which led to a login screen that read, "Spk.ConferenceRoom230." On the laptop was a sticky note with writing. Palm approached the laptop and asked the room, now full of other rioters, "Oh shit, yo who's good at hacking?" Palm recorded the laptop and his actions on his phone. *See* Exhibit 9 at Timestamp 1:10.



*Image 6: Redacted Screenshot of Exhibit 9 from Palm's Phone at Timestamp 1:10*

Palm remained in then-Speaker Pelosi's Conference Room. Another rioter observed, "Wow, they ran outta here." *See* Exhibit 9. Another warned, "You scared little Democrat fucks!" *Id*. Palm stated, "I think I like my new dining room, I pay for it" and sat down at the head of the conference table, putting his feet up on the table. *Id*. Open-source video depicts Palm from another angle, showing his actions in the conference room, including sitting at the table. *See* Exhibit 10; Image 7 (screenshot of Exhibit 10 with Palm squared in yellow). When another rioter smashed glass inside the conference room, Palm exclaimed, "Whoa, we're not Antifa" and left the room. *Id*.



*Image 7: Screenshot of Exhibit 10 at Timestamp 0:50*

While Palm and other rioters—some of them equipped with gas masks and helmets—marched through this suite of offices threatening then-Speaker Pelosi, many of the Speaker's young staff were hiding under desks and tables in a locked conference room mere feet from Palm. *See United States v. Rhodes, et al.* (Case No. 22-CR-15), ECF 565 (sentencing

memorandum detailing these victims and their location). "We turned off all of the lights," one staffer later recounted, "and we hid under the table and no talking, we just said 'Do not speak.'" *See* Exhibit 11.1 ("Pelosi In The House" Documentary clip). As then-Speaker Pelosi's senior advisor, Jamie Fleet testified in another trial before this Court, "I was told, Absolutely don't [call the staffers]. They are hiding. They are trying to keep their phones quiet. We don't want any phone calls. We don't want any texts going off. We don't want to identify that there are people— you know, that they are right on the other side of the door." *See* Transcript 1, *United States v. Minuta, et al.* (Case No. 22-CR-15), 2/21/23PM Tr. at 3278. From their hiding place, a staffer made one phone call, whispering to a law enforcement official, "We need Capitol Police to come into the hallway. They're pounding the doors trying to find her now." *See* Exhibit 11.2 ("Pelosi In The House" Documentary clip). The staffers hid, silent and in the dark, for over an hour, terrified of what people like Palm and the rioters around him might do to them. *Id*.

Palm exited then-Speaker Pelosi's conference room and joined other rioters continuing down the House Hallway. Upon encountering one sign that read "No filming beyond this point" and another that read "This corridor closed," Palm recorded them and defiantly stated, "Oh my, oh dear." *See* Exhibit 9. He then proceeded through two doors with signs that read, "Keep door shut." *Id*. Through those doors was a terrace, overlooking the west side of the Capitol. One story below, police officers were positioning themselves as another bulwark against a crowd of rioters still streaming to the Capitol, dismantling metal barricades, and pouring into the building. Despite being a police cadet, and despite being the son of a Sergeant with the El Paso County Sheriff's Office, Palm did not side with the officers; instead, he yelled to the rioters below: "Watch out for the tear gas!" *See* Exhibit 12.

 

*Images 8 and 9: Screenshots of Exhibit 12 from Palm's Phone at Timestamps 0:03 and 0:31*

**Rotunda**

By 2:40 p.m., Palm joined other rioters in the Rotunda. As the former House Parliamentarian, Thomas Wickham, has previously testified in other trials, the Rotunda is at the very center of the joint session process enshrined in law and required for the transfer of presidential power. *See* Transcript 2, *United States v. Minuta, et al.*, Case No. 22-cr-15, 12/19/22AM Tr. at 1849-51. The "Official Proceeding Montage" video exhibit the government has used in many January 6 trials, Exhibit 13, illustrates with blue arrows how the Senate progresses through the Rotunda and into the House for the joint session. *See* Image 10 (screenshot of Exhibit 13).



*Image 10: Screenshot of Exhibit 13 at Timestamp 1:57*

Indeed, on the morning of January 6, 2021, the joint session initiated the day's process with staffers carrying the required paper ballots for the Electoral College Certification Vote from the Senate to the House through the Rotunda. The solemn and orderly process in the Rotunda, depicted in Image 11 below, is a far cry from the chaotic and criminal mayhem Palm wrought in the Rotunda just two hours later, depicted in Image 12. So long as Palm was in that Rotunda, the joint session, and therefore the transfer of power, could not proceed.



*Image 11: The Joint Session in the Rotunda on January 6*



*Image 12: Palm and Other Rioters in the Rotunda on January 6*

### Palm Exits the Capitol

By 2:45 p.m., Palm exited the Rotunda through the East exit into the East Rotunda Lobby. Reversing his path he had taken through the Capitol, Palm snaked his way back through a House Hallway, the Crypt, and back to the Senate Wing Doors. And, by 2:49 p.m., Palm finally exited the Capitol through a broken window near the same doors he had entered at 2:15 p.m., this time as police officers amassed to forcefully clear the area and seal the doors. *See* Image 13.



*Image 13: Screenshot from Surveillance Footage Near Senate Wing Doors at 2:49 p.m.*

### Defendant's Pre-Arrest FBI Interview

Later that day, Palm called his father, who, as noted, is a Sergeant with the El Paso County Sheriff's Office. He reported some of his actions, but he lied about others. Palm's father ultimately wrote a letter to a Commander at the Sheriff's Office and later shared that letter with the FBI. *See* Exhibit 14. In his letter, Palm's father wrote that, according to Palm, on January 6, the "police [had] made a gap in their line and allowed the crowd to enter the Capital [*sic*]

14

building." Palm allegedly continued, "the crowd surged forward, and I was forced into the building. I thought I would be trampled to death if I tried to fight the crowd." Palm told his father that he entered "only the empty conference room with the empty table and chairs," and when his father asked if there were any computers or electronics in the room, Palm responded, "No I didn't see any." None of that was true. As the video evidence makes clear (*see supra*), Palm deliberately marched up the Northwest Stairs of his own volition and continued toward and into the building while chanting "stop the steal" and "whose house, our house."

On February 6, 2021, Palm met with the FBI for a voluntary pre-arrest interview. He brought in the clothing he wore on January 6—including his hat, sweatshirt, pants, and Trump 2020 flag—and gave them to the FBI. Palm gave a thumb-drive of videos to the FBI, which, he claimed, contained all of the content from his phone related to his actions at the Capitol on January 6. And he gave the FBI his phone, though only after he had deleted everything related to January 6 off of the phone, as he explained to the FBI.[2] In his interview, Palm confessed to many actions, but he also repeated the many falsehoods he had told to his father.

Palm admitted traveling to Washington, D.C. with two other family members to attend a "pro-Trump" rally. He explained that he and his family members attended the speeches at the Ellipse on the morning of January 6, but that he later separated from his family members and joined others to march to the Capitol building.

As noted above, Palm admitted that he entered the Capitol grounds from the West side and observed rioters pulling down the white tarp on the scaffolding of the Inaugural stage. According to Palm, he heard "slight chatter" that Capitol police officers were letting people into the Capitol building. At this point in the interview, Palm told the FBI that he was pushed forward

---

[2] According to Palm, he did not delete from the phone anything that was not on the thumb-drive.

toward the Capitol with the crowd, and that he was fearful of being trampled so he went with the crowd up the stairs. That was false. Palm's own cell phone video, which he recorded as he marched up the Northwest Stairs (Exhibit 3), refutes the self-serving claim Palm repeated to the FBI.  That recording makes clear that Palm had ample space around him. It also establishes, incontrovertibly, Palm's resolve as he went up the stairs to the Capitol. Image 14 below, showing Palm at the top of the stairs, is not the picture of a man terrified of almost just being trampled.



*Image 14: Screenshot of Exhibit 2 at Timestamp 11:10*

In the interview, Palm continued describing the top of the stairs as thinner in crowd density but quickly added that, as he got closer to the Capitol, the crowd thickened again. Palm explained that he walked around and then, eventually, was pushed into a door of the Capitol. Again, his own videos and Capitol surveillance bely any notion that others pushed Palm into the building. Palm joined an angry, violent riot, marched through tear gas and ripped scaffolding, and breached the Capitol building. He did each of these acts deliberately. And while any lie to the FBI is of course significant, the fact that Palm lied to the FBI about a fact that he perceived

as having legal significance—*i.e.*, the cause and mode of his breach into the Capitol building—and that he lied despite having days and weeks to reflect on his actions further underscores the gravity of Palm's dishonesty.

Similarly, in his FBI interview, Palm admitted to the FBI that, after he entered the Capitol, he traveled through various rooms. But, again, he falsely minimized the gravity of his conduct by stating that he was pushed down the House Hallway to then-Speaker Pelosi's conference room. Again, his own recorded video betrays him. Exhibit 9 makes clear that Palm was in lockstep with the other rioters around him as they made their way down the hall and into the conference room. Inside that room, Palm explained that he sat down at the table to rest; yet, Exhibits 9 and 10 show a man who was interested in hacking the open laptop and enjoying the "dining room" he allegedly pays for. If he needed to rest, it was only because he had spent so much energy intentionally breaching the Capitol and acting disorderly.

Palm continued in the interview by detailing the other areas of the Capitol he traversed, and he explained that he left certain rooms when he heard sounds of damaged property and shattered glass. He told the FBI, as seen in the videos he recorded, that he announced to other rioters throughout the Capitol that they should not destroy anything while inside.

### *The Charges and Plea Agreement*

On May 7, 2021, the United States charged Palm by a 4-count Information with corruptly obstructing an official proceeding, in violation of 18 U.S.C. 18 U.S.C. § 1512(c)(2) (Count One); entering and remaining a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); engaging in disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); among other misdemeanors. On June 9, 2021, a federal grand jury charged Palm with the same counts listed above and three additional

misdemeanors. On July 21, 2023, pursuant to a plea agreement, Palm pleaded guilty to Count Three of the Indictment. By plea agreement, Palm agreed to pay $500 in restitution to the Architect of the Capitol.

## II.    Statutory Penalties

Palm now faces a sentencing for engaging in disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2). As noted by the plea agreement and the U.S. Probation Office, Palm faces up to 12 months of imprisonment and a fine of up to $100,000. Palm must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## III.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

Pursuant to the plea agreement, the advisory Sentencing Guidelines calculation is as follows:

Count Three, 18 U.S.C. § 1752(a)(2)

| | |
|---|---|
| U.S.S.G. § 2A2.4(a) | 10 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | <u>-2</u> |
| Total Adjusted Offense Level | **8** |

The final PSR includes a further two-level reduction pursuant to U.S.S.G. § 4C1.1. Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter but was not considered at the time the parties entered into the plea agreement.

The Court should not apply § 4C1.1 here. Notably, application of the § 4C1.1 reduction would not reduce the applicable Guidelines range. At either an offense level of eight or six, the Guidelines range is zero to six months.

The reduction is not warranted here. The January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.  Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for

offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research -reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[3]

The U.S. Probation Office calculated Palm's criminal history as a Category I. PSR at ¶ 49. Accordingly, the U.S. Probation Office calculated Palm's total adjusted offense level, after acceptance and Section 4C1.1, at 6, and his corresponding Guidelines imprisonment range at 0-6

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

months. PSR at ¶¶ 44, 87. Palm's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 6 months' incarceration, 12 months of supervised release, 100 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Palm's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Palm, the

absence of violent or destructive acts is not a mitigating factor. Had Palm engaged in such conduct, he would have faced additional criminal charges.

What he *did* do warrants incarceration. He intentionally pushed forward through throngs of rioters, clouds of tear gas, and rings of alarms until he finally breached the Capitol as part of the first wave of rioters to enter the Senate Wing Doors. When he saw other rioters who had been tear gassed, he helped them by "making a hole." He did not do the same for officers around him. When he looked over a terrace from inside the Capitol, he did not warn the assembled officers of a crowd of rioters dismantling barricades, he warned the rioters "watch out for the tear gas!" And when he heard other rioters screaming for the blood of then-Speaker Pelosi, he barged inside her conference room, asked if anyone could hack the open laptop staffers sprinted away from, and sat himself at the head of the table with his feet up. Palm disrupted the Electoral College Certification Vote, and he later lied about it to the FBI. Repeatedly. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

**B.  Palm's History and Characteristics**

Hunter Palm was a cadet in the El Paso County Sheriff's Office when he stormed inside the Capitol building. His family is in law enforcement. Indeed, it was his father, a Sergeant at the El Paso County Sheriff's Office, that wrote a letter to a Commander about Palm's actions on January 6. *See* Exhibit 14. According to his father's letter, Palm called his father on January 6 and explained some of what he had done. Notably, he lied to his father like he would later lie to the FBI. He acted of his own volition on January 6—in his own words on the Capitol grounds, he was there to "stop the steal." Far from being scared of being trampled, Palm was part of the mob creating the danger he falsely claimed to fear.

Beyond the gravity of his conduct and lies, Palm was in a position to know better. He was raised in a law enforcement household and apparently has family capable of living up to their oath—Palm's father's decision to contact his Sheriff's Office and the FBI to report his son's actions could not have been easy, but it was the right decision. Palm made the wrong one. Confronted with an opportunity to put his lessons into practice on January 6, he chose to join a mob, storm past law enforcement into the Capitol, and disrupt the 2020 presidential election. And then he lied about it repeatedly. That conduct is antithetical to what law enforcement stands for, and he should be punished accordingly.

Palm has no criminal history and was in his early 20s when he committed this crime. While these characteristics are certainly mitigating, he now faces sentencing for misdemeanor disorderly conduct with the intent to disrupt the electoral process. In other words, he faces an advisory Guidelines range of 0-6 months' imprisonment and not a potential range of 15-21 months for felony obstruction of an official proceeding. So the government respectfully requests the Court consider Palm's serious conduct and multiple lies to both his law enforcement father and the FBI and implement a sentence of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power."); *see also United States v. Joshua*

*Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected") (Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

A serious sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

As noted by this Court during a different sentencing hearing,

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

*United States v. Hodgkins*, No. 21-cr-188, Sent. Tr. at. 69-70. The attack on the Capitol means "that it will be harder today than it was [before January 6] for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of

us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

As this Court is well aware, the justice system's reaction to January 6 bears the weighty responsibility of impacting whether January 6 becomes an outlier or a watershed moment. "By nearly every measure, political violence is seen as more acceptable today than it was five years ago." Adrienne LaFrance, *The New Anarchy: America faces a type of extremist violence it does not know how to stop*, THE ATLANTIC, Mar. 6, 2023 (citing a 2022 UC Davis poll[4] that found one in five Americans believes political violence would be "at least sometimes" justified, and one in 10 believes it would be justified if it meant the return of President Trump). Left unchecked, this impulse threatens our democracy.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a serious sentence, though the defendant took steps soon after January 6 to right his wrongs. Palm did interview with the FBI, provide a number of videos he recorded in and around the Capitol, and provide the clothes he was wearing that day. And he has agreed to plead guilty to a misdemeanor offense for his actions. These actions suggest that he may have accepted responsibility for what he did, at least to some extent.  That said, Palm's conduct was grave. He acted on January 6 out of anger because his preferred candidate did not win. And he lied to his own law enforcement father and to the FBI about what he did. That is serious and reflects someone willing to break the law and bend the truth for his own gain. A period of incarceration is warranted to deter such conduct in the future.

---

[4] *See* health.ucdavis.edu/vprp/pdf/Political-Violence-Fact-Sheet%201_7-21-22.pdf

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Palm based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Palm has pleaded guilty to Count Three of the Indictment, charging him with engaging in disruptive or disorderly conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2). This offense is a Class A/B misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Kelly O'Brien*, 21-cr-633 (RCL), the defendant pled guilty to 18 U.S.C. § 1752(a)(1). O'Brien's conduct on January 6th was similar to that of Palm. Like Palm, O'Brien entered the Speaker's office suite and made inappropriate comments ("we have to

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

smash this place" versus Palm's "who's good at hacking"). Unlike Palm, O'Brien did not lie to the FBI during her interview and was only present in the Capitol Building for 21 minutes compared to Palm's 30 minutes. O'Brien had a criminal history score of III due to two prior misdemeanor convictions and was sentenced to a term of 90 days of incarceration.

In *United States v. Paul Hodgkins*, 21-cr-188 (RDM), Hodgkins pled guilty to 18 U.S.C. § 1512(c)(2). Like Palm, Hodgkins unlawfully entered the Capitol and made it to a sensitive space that is critical to the joint session (the Senate Floor). While Hodgkins entered the Capitol with eye goggles, rope, gloves, and a flag, Palm entered with an American flag and a Trump 2020 flag and later lied to the FBI about his conduct. This Court sentenced Hodgkins to a term of 8 months of incarceration. Hodgkins and Palm were both indicted on one count of 18 U.S.C. § 1512(c)(2), but Palm was afforded the opportunity to plead guilty to 18 U.S.C. § 1752(a)(2) for a number of reasons. *See United States v. Cua,* 21-cr-107, sentencing tr. at 198 ("But your youth and immaturity is a factor that I do need to consider, along with your lack of criminal history and, I think, your genuine remorse.").

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the

sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Palm must pay $500 in restitution, which reflects in part the role Palm played in the riot on January 6.[7] Plea Agreement at ¶ 12. As the plea agreement

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can

28

reflects, the riot at the United States Capitol had caused "approximately $2.88" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022." *Id.*[8] Palm's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 12.

## VI.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Hunter Palm to 6 months' incarceration, 12 months of supervised release, 100 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Palm's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


BY:     _____
Troy A. Edwards, Jr.
N.Y. Bar No. 5453741
Shalin Nohria
Assistant United States Attorneys
U.S. Attorney's Office, District of Columbia
Washington, D.C. 20530

---

be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[8] As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.